# EXHIBIT O

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SACRAMENTO

3

4    —————————————————————————

5   JFURTI, LLC,            )

6           Plaintiff,     )

7             vs.          ) Case No. 34-2018-00227994

8   SUNEET SINGAL, ET AL.,   )

9           Defendants.    )

10  —————————————————————————)

11

12       JUDGMENT DEBTOR EXAMINATION OF SUNEET SINGAL

13              Sacramento, California

14              Friday, April 5, 2019

15

16

17

18

19

20

21

22  REPORTED BY:

23  Matthew Sculatti

24  CSR No. 13558

25  PAGES 1 - 87



EXHIBIT
D
Singal
6-21-19

                                    Page 1

1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF SACRAMENTO

3

4       _____

5       JFURTI, LLC,                      )

6                    Plaintiff,           )

7                    vs.                  ) Case No. 34-2018-00227994

8       SUNEET SINGAL, ET AL.,            )

9                    Defendants.          )

10      _____)

11

12

13

14

15          Judgment Debor Examination of SUNEET SINGAL, taken

16      before Matthew Sculatti, a Certified Shorthand Reporter

17      for the State of California, commencing at 9:29 A.M.,

18      Friday, April 5, 2019, at 720 9th Street, Department 37,

19      Sacramento, California 95814.

20

21

22

23

24

25

                                                    Page 2

```
 1    APPEARANCES:

 2

 3

 4       FOR PLAINTIFF JFURTI, LLC:

 5            MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO

 6            BY:  ANDY LEVIN, ATTORNEY AT LAW

 7            2029 Century Park East

 8            Suite 3100

 9            Los Angeles, California 90067

10            TEL:  (310) 586-3200

11            ablevin@mintz.com

12

13       FOR DEFENDANT SUNEET SINGAL:

14            BRINEN & ASSOCIATES

15            BY:  JOSHUA D. BRINEN, ATTORNEY AT LAW

16            90 Broad Street

17            Second Floor

18            New York, New York 10004

19            TEL:  (212) 330-8151

20            FAX:  (212) 227-0201

21            jbrinen@brinenlaw.com

22

23

24

25
```

Page 3

1       FOR BRANDON FUGAL:

2              FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

3              BY:   JASON E. RIOS, ATTORNEY AT LAW

4              400 Capitol Mall

5              Suite 1450

6              Sacramento, California 95814-4434

7              TEL:   (916) 329-7400

8              FAX:   (916) 329-7435

9              jrios@ffwplaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
1                        I N D E X

2   WITNESS                  EXAMINATION              PAGE

3   SUNEET SINGAL         By Mr. Levin                  6

4

5                        E X H I B I T S

6   EXHIBIT       DESCRIPTION                         PAGE

7   Exhibit A     Previous Transcript                   9

8   Exhibit B     Excerpts of S-4                      11

9   Exhibit C     Declaration of Suneet Singal         17

10  Exhibit D     Notice of Default                    31

11  Exhibit E     Schedule 13D for FC Global Realty    81

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                               Page 5
```

```
1              I guess we can start with --

2              MR. LEVIN:  I'd like to enter into evidence --

3     ignore the exhibits on here but enter into evidence

4     Exhibit A a transcript from the previous judgment debtor

5     exam.

6                   (Exhibit A was marked for

7                        identification.)

8     BY MR. LEVIN:

9         Q    At your last session of deposition, you testified

10    that you are the controlling person of FCMA,

11    First Capital Master Advisor.

12             Do you recall that testimony, sir?

13        A    I do.

14        Q    What does it mean that you here the controlling

15    person?

16        A    Chief executive officer.

17        Q    What are your roles as CEO?

18        A    Negotiate transactions.  Struck financing.

19    Procure acquisitions.  Look for opportunities.  Add them

20    to the ownership.

21        Q    Do you control the bank accounts of FCMA?

22        A    I don't.

23        Q    Who does?

24        A    The independent trustees.

25        Q    Who are the independent trustees?
```

                                                    Page 9

```
 1        A      Jeanine Devries and Steven Goodwin.

 2        Q      How do you spell Devries?

 3        A      D-e-v-r-i-e-s.

 4        Q      Those, you say, are the -- who is the owner of

 5    FCMA?

 6        A      It's an irrevocable family trust.

 7        Q      What is the name of the trust?

 8        A      The Landier-Singal Family Trust.

 9        Q      Do you own an interest in FCMA?

10        A      No.

11        Q      Do you still control FCMA?

12        A      I don't know what you mean.

13        Q      Are you still the CEO?

14        A      I'm still a CEO, yes.

15        Q      Have you been CEO since the beginning?

16        A      I have.

17        Q      Has your relationship with FCMA ever changed over

18    the course of the existence of the entity?

19        A      I'm not sure.  Not that I recall.

20        Q      Have you ever received compensation, other income

21    from FCMA?

22        A      I have not.

23        Q      You've never been compensated for your role as

24    CEO?

25        A      That's correct.
```

Page 10

1

2

3

4           I, SUNEET SINGAL, do solemnly declare under

5    penalty of perjury that the foregoing is my judgment

6    debtor examination under oath; that these are the

7    questions asked of me and my answers thereto; that I have

8    read same and have made the necessary corrections,

9    additions, or changes to my answers that I deem necessary.

10          In witness thereof, I hereby subscribe my name

11   this day of _____, 2019.

12

13

14

15

16

17

18                              _____

19                                   SUNEET SINGAL

20

21

22

23

24

25

                                                    Page 86

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER


I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name


Dated: April 6, 2019


MATTHEW SCULATTI, CSR No. 13558

Page 87

# EXHIBIT P

Case 2:18-mc-00161-TLN-DB   Document 20-1   Filed 07/02/19   Page 12 of 44

**Volume II**
**Suneet Singal**                                                **Jfurti, LLC vs. Suneet Singal, et al.**

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF SACRAMENTO

3

4       JFURTI, LLC, a Delaware
         Corporation,
5
                         Petitioner,
6
             -vs-                          Case No.
7                                          34-2018-00227994
         SUNEET SINGAL, an
8        individual,

9                        Respondent.

10

11

12

13

14        JUDGMENT DEBTOR'S EXAMINATION OF SUNEET SINGAL

15                        Volume II

16                720 Ninth Street, California

17                     June 21, 2019

18

19

20

21

22     Reported By:

23     Jennifer Schumacher

24     CSR No. 9763

25     Job No: 10057440

**Volume II**
**Suneet Singal**                                    **Jfurti, LLC vs. Suneet Singal, et al.**

```
 1    APPEARANCES:

 2    For Petitioner:

 3              MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO
              BY:  ANDREW B. LEVIN, Esq.
 4              2029 Century Park East, Suite 3100
              Los Angeles, California 90067
 5              (424) 259-4008
              Ablevin@mintz.com
 6

 7    ALSO PRESENT:

 8              Danish Mir

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SACRAMENTO

3

4     JFURTI, LLC, a Delaware
      Corporation,
5
                        Petitioner,
6
           -vs-                        Case No.
7                                      34-2018-00227994
      SUNEET SINGAL, an
8     individual,

9                       Respondent.

10

11

12

13

14

15

16

17

18

19

20      JUDGMENT DEBTOR'S EXAMINATION OF SUNEET SINGAL,

21    taken on behalf of Petitioner, at 720 Ninth Street,

22    Sacramento, California, beginning at 11:19 a.m., and

23    ending at at 2:56 p.m., on Friday, June 21, 2019,

24    before Jennifer Schumacher, CSR No. 9763.

25

```
 1                     I N D E X
 2    WITNESS:  Suneet Singal
 3    EXAMINATION                               PAGE
 4    By Mr. Levin                               5
 5
 6
 7                    ---o0o---
 8
 9                 E X H I B I T S
10    Petitioner's           Description          Page
11      Exhibit A   Minute Order, 4/5/19           5
12      Exhibit B   Trust Agreement for the        8
13                  Ladnier-Singal Trust Dated
14                  December 14, 2015
15      Exhibit C   Amendment to the Ladnier-Singal  9
16                  Trust
17      Exhibit D   Judgment Debtor Examination of  18
18                  Suneet Singal, 4/5/19
19      Exhibit E   Chase Checking Summary,        55
20                  2//9/19-3/8/19
21      Exhibit F   Assignment of LLC Membership   77
22                  Sale Consideration
23      Exhibit G   Restraining Notice             93
24
25                    ---o0o---
```

1    Partnership, LLP as FCOP or FC Operating Partnership.

2         A.    Yes.

3         Q.    And First Capital Master Advisors, LLC as FCMA.

4         A.    Sure.   Can we pause briefly?

5         Q.    Sure.   Off the record.

6              (Discussion off the record.)

7    BY MR. LEVIN:

8         Q.    All right.   So I'm also going to refer to SRS,

9    LLC as SRS.

10        A.    Okay.

11        Q.    And then unless otherwise indicated

12   specifically, the time period of each question is going

13   to be from August 7th, 2011 to the present; is that

14   clear?

15        A.    Okay.

16        Q.    All right.   So I'd like to introduce as Exhibit

17   B the Trust Agreement for the Ladnier-Singal Trust Dated

18   December 14th, 2015.

19        A.    Okay.

20                      (Exhibit B was

21                      marked for identification.)

22   BY MR. LEVIN:

23        Q.    And as Exhibit C, a document identified as the

24   Amendment to the Ladnier Singal Trust Dated December

25   14th, 2015.

 1      A.    Okay.

 2                  (Exhibit C was

 3                  marked for identification.)

 4   BY MR. LEVIN:

 5      Q.    So both Exhibit B and Exhibit C, do you

 6   recognize these documents?

 7      A.    Yes, I do.

 8      Q.    Both Exhibit B and Exhibit C, I'll refer to

 9   Exhibit B as the trust agreement.

10      A.    Yes.

11      Q.    And the Exhibit C as the trust amendment.

12      A.    Yes.

13      Q.    Both the trust agreement and trust amendment

14   were produced by your wife, Majique Ladnier, and she

15   testified that she received them from you.  Is that

16   correct, that she received these documents from you?

17      A.    Yes.

18      Q.    Why have you not produced these documents?

19      A.    I thought I did to counsel, or I might have

20   just asked counsel to call the lawyer who drafted them.

21      Q.    But they have -- where did you get these

22   documents from before providing them to your wife?

23      A.    Lawyers.

24      Q.    Which lawyer?

25      A.    I thought Michael Hanks was one of them.

1      Q.    And is there documentation of the deal?

2      A.    Yeah.

3      Q.    Can that be provided also, then?

4      A.    Of course.  If you figure something out, let us

5   know.  We'll be glad to take your advice.

6      Q.    So you also testified that you do not control

7   the bank accounts of FCMA; is that correct?

8      A.    Yeah, I don't go on any bank accounts

9   currently.

10     Q.    Now, what bank accounts does FCMA have?

11     A.    Doesn't have any right now.

12     Q.    It doesn't have any?

13     A.    Nope.

14     Q.    You're not aware of any bank accounts?

15     A.    It doesn't have any.

16     Q.    You also testified if you look at page 9 of

17  Exhibit D, lines 21 -- sorry -- line 21, that the

18  independent trustees of the trust control the bank

19  accounts of FCMA; is that correct?

20     A.    They would control it if there was bank

21  accounts, yes.  There is no existing accounts, though.

22  We tried to open up in a couple banks, but the

23  compliance department came back and said we don't want

24  to do anything because of the Frydman.  We don't want to

25  be exposed to Jacob Frydman.

1      Q.   Now, has FCMA ever had bank accounts?

2      A.   It did, yeah.   FCMA had a bank account at Bank

3   of America.

4      Q.   And when was that bank account closed?

5      A.   When the Jacob Frydman judgment came up.

6      Q.   So when was that?

7      A.   2017.

8      Q.   And who had control of that bank account while

9   it was active?

10     A.   I originally did, but the bank actually shut it

11  down.  The bank actually shut it down and said that

12  their compliance department felt that the risk exposure

13  was too high with Frydman, and they did not want to have

14  to deal with Frydman.  Looks like you got some secret

15  information there.

16     Q.   I'd like to introduce into evidence now as

17  Exhibit E.

18               (Exhibit E was

19               marked for identification.)

20  BY MR. LEVIN:

21     Q.   This is a bank statement for the month of

22  February.  It's for the time period February 9th, 2019

23  through March 8th, 2019 for the bank account of Majique

24  Ladnier for JPMorgan Chase, account ending in 5037.

25     A.   Okay.

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were placed under oath; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; further

9    that the foregoing is a true record of the testimony

10   given.

11         Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript { } was { X } was not requested.

15

16         I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: June 27, 2019

23

24   _____

25         Jennifer Schumacher, CSR No. 9763

Case 2:18-mc-00161-TLN-DB   Document 20-1   Filed 07/02/19   Page 21 of 44
Volume II
Suneet Singal                                      Jfurti, LLC vs. Suneet Singal, et al.

```
 1              DECLARATION UNDER PENALTY OF PERJURY
 2    Case Name: Jfurti, LLC vs. Suneet Singal, et al.
 3    Date of Deposition: 06/21/2019
 4    Job No.: 10057440
 5
 6               I, SUNEET SINGAL, hereby certify
 7    under penalty of perjury under the laws of the State of
 8    _____ that the foregoing is true and correct.
 9               Executed this _____ day of
10    _____, 2019, at _____.
11
12
13               _____
14                         SUNEET SINGAL
15
16    NOTARIZATION (If Required)
17    State of _____
18    County of _____
19    Subscribed and sworn to (or affirmed) before me on
20    this _____ day of _____, 20__,
21    by_____,    proved to me on the
22    basis of satisfactory evidence to be the person
23    who appeared before me.
24    Signature: _____ (Seal)
25
```

# EXHIBIT Q

S-4/A 1 s115608_s4a.htm S-4/A

As filed with the Securities and Exchange Commission on January 30, 2019

**Registration No. 333-228304**

### SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

Amendment No. 2 to

# FORM S-4
### REGISTRATION STATEMENT UNDER
### THE SECURITIES ACT OF 1933

# FC GLOBAL REALTY INCORPORATED
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| Nevada | 6798 | 59-2058100 |
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

2300 Computer Drive, Building G
Willow Grove, PA 19090
(215) 830-1430

**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Michael R. Stewart
Chief Executive Officer
2300 Computer Drive, Building G
Willow Grove, PA 19090
(215) 830-1430

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| **Louis A. Bevilacqua, Esq.** | **John E. Hartman** | **Richard M. Morris, Esq.** |
| **BEVILACQUA PLLC** | **Chief Executive Officer** | **Allegaert Berger & Vogel LLP** |
| **1050 Connecticut Avenue, NW** | **Gadsden Growth Properties, Inc.** | **111 Broadway, 20th Floor** |
| **Suite 500** | **15150 N. Hayden Road, Suite 220** | **New York, New York 10006** |
| **Washington, DC 20036** | **Scottsdale, Arizona 85260** | **Tel: (212) 571-0550** |
| **(202) 869-0888** | **(480) 750-8700** | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement and upon completion of the merger described in the accompanying joint proxy statement/prospectus.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer  ☐ | Accelerated filer  ☐ |
| Non-accelerated filer  ☐ | Smaller reporting company ☒ |
| | Emerging growth company  ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for comply with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

## CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered[1] | Amount to be registered | Proposed maximum offering price per unit | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock, $0.01 par value | 27,860,068[2] | N/A | $7,243,617.68 [9] | $877.93 |
| Common Stock, $0.01 par value | 531,805,174[3] | N/A | $1,772,683.91 [10] | $214.85 |
| 7% Series A Cumulative Convertible Perpetual Preferred Stock, $0.01 par value | 389,766[4] | N/A | N/A | (11) |
| Series B Non-Voting Convertible Preferred Stock | 1,906,573[5] | N/A | N/A | (11) |
| Series C Participating Convertible Preferred Stock, $0.01 par value | 2,500,000[6] | N/A | N/A | (11) |
| Warrants to Purchase Common Stock | 10,177,753[7] | N/A | N/A | (11) |
| Options to Purchase Common Stock | 77,930[8] | N/A | N/A | (11) |
| **TOTALS** | **574,717,264** | **N/A** | **$9,016,301.59** | **$1,092.78** [12] |

(1)     The securities being registered under this registration statement are the securities of Gadsden Properties, Inc., a Maryland corporation not yet in existence at the time of filing of this registration statement, or GPI. In accordance with Instruction 3 to the signature page of Form S-4, FC Global Realty Incorporated, a Nevada corporation, or FC Global, is deemed to be the registrant and is so designated on the cover page and signature page of this registration statement as it is the party to the conversion transaction that will occur immediately prior to the issuance of the securities being registered.

(2)     Represents the maximum number of shares of the registrant's common stock estimated to be issued upon conversion of FC Global into GPI, which includes (i) 27,336,249 shares of FC Global common stock; (ii) 77,390 shares of common stock issuable upon the exercise of outstanding FC Global stock options; and (iii) 446,429 shares of common stock issuable upon the exercise of outstanding FC Global warrants, in each case issued and outstanding as of January 28, 2019.

(3)     Represents the sum of:

        (A) 443,170,978, which represents the maximum number of shares of the registrant's common stock estimated to be issued upon completion of the merger of FC Merger Sub, Inc. with and into Gadsden Growth Properties, Inc., or Gadsden, as described in the accompanying joint proxy statement/prospectus, calculated as (i) the sum of (1) Gadsden common stock that is issued and outstanding on November 6, 2018, (2) Gadsden common stock that is issuable upon the conversion of Gadsden preferred stock issued and outstanding on such date, (3) Gadsden common stock that is issuable upon the conversion of Gadsden preferred stock that may be issued by Gadsden after such date and prior to the effective date of the merger, and (4) Gadsden common stock that is issuable upon the exercise of Gadsden warrants issued and outstanding on such date, multiplied by (ii) the exchange ratio as defined in the accompanying joint proxy statement/prospectus contained herein; and

        (B) 88,634,196, which number is an estimate of the total number of loss shares that may be issued pursuant to the post-closing remedy provisions of the merger agreement, which does not constitute a limit on the number of such shares that may be issued. See "The Merger Agreement – Indemnification."

(4)     Represents shares of 7% Series A Cumulative Convertible Perpetual Preferred Stock that are estimated to be issued upon completion of the merger, based on 389,766 shares of Gadsden 7% Series A Cumulative Convertible Perpetual Preferred Stock outstanding on November 6, 2018.

(5)

Represents shares of Series B Non-Voting Convertible Preferred Stock that are estimated to be issued upon completion of the merger, based on 1,906,573 shares of Gadsden Series B Non-Voting Convertible Preferred Stock outstanding on November 6, 2018.

(6)     Represents shares of Series C Participating Convertible Preferred Stock that are estimated to be issued upon completion of the merger, based on 496,983 shares of Gadsden Series C Participating Convertible Preferred Stock outstanding on November 6, 2018 and up to 2,003,017 additional shares of such preferred stock that may be issued by Gadsden after such date and prior to the effective date of the merger.

(7)     Represents (i) warrants for the purchase of 446,429 shares of common stock that will be issued upon completion of the conversion in exchange for warrants issued by FC Global and (ii) warrants for the purchase of 9,731,324 shares of common stock that will be issued upon completion of the merger in exchange for warrants issued by Gadsden.

(8)     Represents options for the purchase of shares of common stock that will be issued upon completion of the conversion in exchange for options issued by FC Global.

(9)     Pursuant to Rule 457(c) under the Securities Act, and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price was calculated by taking the product of (a) $0.26, the average of the high and low prices for a share of common stock of FC Global as reported on the OTC Pink marketplace on November 6, 2018, and (b) the maximum possible number of shares of the registrant's common stock to be issued in connection with the conversion (27,860,068).

(10)    Estimated solely for purposes of calculation of the registration fee in accordance with Rule 457(f) of the Securities Act. Gadsden is a private company and no market exists for its equity securities. Gadsden has accumulated a capital deficit; therefore, pursuant to Rule 457(f)(2) under the Securities Act, the proposed maximum offering price is one-third of the aggregate par value of Gadsden's capital stock being acquired in the proposed merger, which is calculated by taking one-third of the product of the par value of $0.01 and the maximum number of shares of Gadsden capital stock that may be exchanged in the merger, or 531,805,174 shares of Gadsden capital stock (computed as of November 6, 2018, the latest practicable date prior to the date of filing this registration statement, and inclusive of all shares of Gadsden capital stock issuable upon conversion of any securities convertible into or exercisable for shares of Gadsden capital stock).

(11)    These securities are included within the fee relating to the registration of the common stock listed above. Pursuant to Rule 457 of the Securities Act, no separate fee is required.

(12)    Previously paid.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission, acting pursuant to such Section 8(a), may determine.**

Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This joint proxy statement/prospectus shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.

PRELIMINARY—SUBJECT TO COMPLETION—DATED JANUARY 30, 2019




**CONVERSION AND MERGER PROPOSAL—YOUR VOTE IS VERY IMPORTANT**

[ ], 2019

Dear FC Global Realty Incorporated and Gadsden Growth Properties, Inc. Stockholders:

On behalf of the boards of directors of FC Global Realty Incorporated ("FC Global") and Gadsden Growth Properties, Inc. ("Gadsden"), FC Global is pleased to enclose the joint proxy statement/prospectus relating to (i) the conversion under Nevada and Maryland law of FC Global, a Nevada corporation, into Gadsden Properties, Inc., a Maryland corporation ("GPI"), and (ii) the merger of FC Merger Sub, Inc., a Maryland corporation and wholly-owned subsidiary of FC Global ("FC Merger Sub") with and into Gadsden, with Gadsden surviving the merger, pursuant to the terms of an agreement and plan of merger entered into among FC Global, FC Merger Sub, Gadsden and Gadsden Growth Properties, L.P. on November 8, 2018, as amended as of December 27, 2018, January 14, 2019 and January 25, 2019.

If the conversion and the merger are completed, (i) FC Global stockholders will receive one share of GPI common stock for each share of FC Global common stock that they own, and (ii) Gadsden stockholders will receive shares of GPI stock for shares of Gadsden stock that they own as follows: **each share of Gadsden common stock will be converted into 21.529 shares of GPI common stock and each share of Gadsden 7% Series A Cumulative Convertible Perpetual Preferred Stock, Gadsden Series B Non-Voting Convertible Preferred Stock and Gadsden Series C Participating Convertible Preferred Stock will be converted into 1 share of GPI 7% Series A Cumulative Convertible Perpetual Preferred Stock, 1 share of GPI Series B Non-Voting Convertible Preferred Stock and 1 share of GPI Series C Participating Convertible Preferred Stock, respectively (each with rights of equal tenor to such series of Gadsden preferred stock), each subject to adjustment as described in more detail in the accompanying joint proxy statement/prospectus under the heading "The Merger Agreement—Merger Consideration"** (including the automatic conversion of the GPI Series B Non-Voting Convertible Preferred Stock into common stock). Based on the closing price of a share of FC Global common stock on [ ], 2019, the most recent trading day prior to the date of the accompanying joint proxy statement/prospectus for which this information was available, the merger consideration represented approximately $[ ] in value per share of Gadsden common stock. The value of the consideration to be received by Gadsden stockholders will fluctuate with changes in the price of the FC Global common stock. We urge you to obtain current market quotations for FC Global common stock. FC Global common stock is traded on the OTC Pink Market and the Tel Aviv Stock Exchange ("TASE") under the symbol "FCRE". In connection with the conversion and the merger, FC Global stockholders are cordially invited to attend a special meeting of stockholders of FC Global to be held on [ ], 2019 at FC Global's office located at 2300 Computer Avenue, Building G, Willow Grove, PA 19090 at 9:30 a.m. (Eastern Standard Time), and Gadsden stockholders are cordially invited to attend a special meeting of stockholders of Gadsden to be held on [ ], 2019 at Gadsden's office located at 15150 N. Hayden Road, Suite 220, Scottsdale, Arizona 85260 at 3:00 p.m. (Eastern Standard Time).

**Your vote is very important, regardless of the number of shares you own. We cannot complete the conversion and the merger and the merger consideration will not be issued unless (i) FC Global stockholders approve the**

conversion and the issuance of shares of GPI stock in connection with the merger and (ii) Gadsden stockholders adopt the merger agreement. Approval of the conversion requires the affirmative vote of holders of at least a majority of the outstanding shares of FC Global common stock and approval of the issuance of shares of GPI stock in connection with the merger requires the affirmative vote of a majority of the votes cast at the FC Global special meeting. Adoption of the merger agreement requires the affirmative vote of holders of two-thirds of the outstanding shares of Gadsden common stock and 7% Series A Cumulative Convertible Perpetual Preferred Stock, voting as a single class on an as-converted basis. Every vote counts.

At the special meeting of stockholders of FC Global, FC Global stockholders will be asked to vote on (i) a proposal to approve the conversion of FC Global, a Nevada corporation, into GPI, a Maryland corporation, (ii) a proposal to approve the issuance of shares of GPI stock in connection with the merger and (iii) a proposal to adjourn the FC Global special meeting if necessary to solicit additional proxies if there are not sufficient votes at the time of the special meeting, or any adjournment or postponement thereof, to approve the conversion and the issuance of shares of GPI stock in connection with the merger.

**FC Global's board of directors unanimously determined that the merger agreement, the conversion, the merger and the other transactions contemplated by the merger agreement, including the issuance of shares of GPI stock in connection with the merger, are advisable and fair to and in the best interests of FC Global stockholders and unanimously recommends that FC Global stockholders vote (i) FOR the approval of the conversion, (ii) FOR the approval of the issuance of shares of GPI stock in connection with the merger, and (ii) FOR the adjournment of the FC Global special meeting if necessary to solicit additional proxies if there are not sufficient votes at the time of the special meeting, or any adjournment or postponement thereof, to approve the conversion and the issuance of shares of GPI stock in connection with the merger.**

At the special meeting of stockholders of Gadsden, Gadsden stockholders will be asked to vote on (i) a proposal to adopt the merger agreement, (ii) a proposal to adjourn from time to time the Gadsden special meeting if necessary to solicit additional proxies if there are not sufficient votes at the time of the special meeting, or any adjournment or postponement thereof, to adopt the merger agreement, and (iii) a proposal to approve, on an advisory (non-binding) basis, compensation that will or may be paid or provided by Gadsden to its named executive officers in connection with the merger.

**Gadsden's board of directors unanimously determined that the merger agreement, the merger and the other transactions contemplated by the merger agreement are advisable and fair to and in the best interests of Gadsden stockholders and unanimously recommends that Gadsden stockholders vote (i) FOR the adoption of the merger agreement, (ii) FOR the adjournment from time to time of the Gadsden special meeting if necessary to solicit additional proxies if there are not sufficient votes at the time of the special meeting, or any adjournment or postponement thereof, to adopt the merger agreement, and (iii) FOR the non-binding advisory proposal to approve compensation that will or may be paid or provided by Gadsden to its named executive officers in connection with the merger.**

We estimate that GPI may issue up to approximately [ ] shares of its common stock in connection with the conversion (on an as-converted basis) and up to approximately [ ] shares of its common stock to Gadsden stockholders upon completion of the merger (on an as-converted basis and including shares that will be held in escrow), based on the number of shares of FC Global and Gadsden stock issued and outstanding as of [ ], the most recent practicable date for which such information was available. Based on the number of shares of FC Global common stock and Gadsden stock outstanding as of such date, immediately following the completion of the conversion and the merger, FC Global stockholders immediately prior to the conversion and the merger are expected to own approximately 6% of GPI's outstanding common stock and former Gadsden stockholders are expected to own approximately 94% of GPI's outstanding common stock (on a fully-diluted basis), subject to adjustment as provided for in the merger agreement, including that some GPI shares may be cancelled and not released from escrow to Gadsden stockholders as of the effective date of the merger.

The accompanying joint proxy statement/prospectus provides important information regarding the FC Global special meeting and the Gadsden special meeting and a detailed description of the merger agreement, the conversion and the merger, GPI's stock issuances, the adjournment proposals and non-binding advisory proposal to approve compensation that will or may be paid or provided by Gadsden to its named executive officers in connection with the merger. We urge you to read the accompanying joint proxy statement/prospectus (and any documents incorporated by reference into the accompanying joint proxy statement/prospectus) carefully. **Please pay particular attention to the section "Risk Factors" beginning on page 51 of the accompanying joint proxy statement/prospectus.** You can also obtain information about FC Global from documents that FC Global previously has filed with the Securities and Exchange Commission.

Whether or not you expect to attend your company's special meeting, the details of which are described in the accompanying joint proxy statement/prospectus, please immediately submit your proxy by telephone, by the Internet or by completing, signing, dating and returning your signed proxy card(s) in the enclosed prepaid return envelope so that your shares may be represented at the applicable special meeting.

If FC Global stockholders have any questions or require assistance in voting their shares, they should call Michele Pupach at (215) 830-1430. If Gadsden stockholders have any questions or require assistance in voting their shares, they should call John Hartman at (480) 750-8700.

We hope to see you at the applicable special meeting and look forward to the successful completion of the conversion and the merger.

Sincerely,                                                        Sincerely,

/s/ Michael R. Stewart                                            /s/ John E. Hartman

Michael R. Stewart                                                John E. Hartman
President                                                         Chief Executive Officer.
FC Global Realty Incorporated                                     Gadsden Growth Properties, Inc.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued under the accompanying joint proxy statement/prospectus or determined that the accompanying joint proxy statement/prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The accompanying joint proxy statement/prospectus is dated [ ], 2019 and is first being mailed to stockholders on or about [ ], 2019.

On March 31, 2016, FC Global completed the sale to The Lotus Global Group, Inc. of all of the tangible and intangible assets of the Omnilux product line for $220 thousand ($110 thousand was received as a refundable deposit during December 2015 in advance and $110 thousand was received in April 2016), pursuant to the Agreement for Sale of Assets dated March 31, 2016.

149

On August 30, 2016, FC Global entered into an Asset Purchase Agreement for the sale of its Neova product line. The sale was completed on September 15, 2016, resulting in immediate cash proceeds to FC Global of $1.5 million and FC Global recorded a loss of $1,731 thousand from the transaction during the third quarter ended September 30, 2016, and for the year ended December 31, 2016.

On October 4, 2016, FC Global entered into an Asset Purchase Agreement with ICTV for the sale of its consumer division for $9.5 million, including $5 million in cash plus a $4.5 million royalty agreement. FC Global also entered into a Transition Services Agreement, pursuant to which FC Global agreed to provide ICTV with certain accounting, benefit, payroll, regulatory, IT support and other services for periods ranging from approximately three months to up to one year following the closing date, during which time ICTV would arrange to transition the services it receives to its own personnel. This transaction was completed on January 23, 2017.

On July 12, 2017, FC Global entered into a Termination and Release Agreement under which the Asset Purchase Agreement described above was terminated and is of no further force and effect, except for certain surviving rights, obligations and covenants described in the Termination and Release Agreement. Pursuant to the Termination and Release Agreement, ICTV paid FC Global $2 million in cash and FC Global agreed that ICTV will have no further royalty or other payment obligations under the Asset Purchase Agreement. As partial consideration for the releases provided by ICTV pursuant to the Termination and Release Agreement and in accordance with the terms therein, on July 12, 2017, FC Global entered into a Bill of Sale and Assignment, which provides that FC Global shall sell, assign, transfer, convey and deliver to ICTV, and ICTV purchase and accept from FC Global, all of the right, title and interest, legal or equitable, in and to a deposit in the amount of $210 thousand held by a consumer division vendor, Sigmatron International, Inc., pursuant to an arrangement between FC Global and Sigmatron International, Inc.

**Organizational Chart**

The following chart depicts FC Global's organizational structure following the sale of its prior business and the contribution transaction. All subsidiaries are wholly-owned unless otherwise indicated.



**Real Estate Business**

FC Global's focus is to build FC Global into a leading real estate, asset management and development company, concentrating primarily on investments in high yield income producing assets and other opportunistic commercial

| Name and Address of Beneficial Owner | Amount of Beneficial Ownership[1] | | | Percent of Common Stock[2] | Percent of Series A Preferred Stock[3] | Percent of Series C Preferred Stock[4] | Percent of Total Voting Stock[5] |
|---|---|---|---|---|---|---|---|
| | Common Stock | Series A Preferred Stock | Series C Preferred Stock | | | | |
| John Hartman, CEO and Director [6] | 1,202,000 | 0 | 0 | 22.8% | * | * | 17.2% |
| George Bell, COO [6] | 556,000 | 0 | 0 | 10.5% | * | * | 7.9% |
| Scott Crist, CFO [6] | 500,000 | 0 | 0 | 9.5% | * | * | 7.1% |
| Brian Ringel, Corporate Controller[6] | 50,000 | 0 | 0 | 1.0% | * | * | * |
| Richard M. Morris, Secretary[6] | 75,000 | 0 | 2,500 | 1.4% | * | * | 1.1% |
| Larry E. Finger, Chairman [6][7] | 250,000 | 0 | 33,004 | 4.7% | * | 6.6% | 4.2% |
| James Walesa, Vice Chairman [6] | 226,000 | 0 | 0 | 4.3% | * | * | 3.2% |
| Jay M. Gratz, Director [6] | 50,000 | 0 | 5,314 | 1.0% | * | 1.1% | * |
| B.J. Parrish, Director [6] | 60,000 | 0 | 0 | 1.1% | * | * | * |
| Russell C. Platt, Director [6][8] | 50,000 | 448,606 | 0 | 1.0% | 100.0% | * | 16.7% |
| Robert G. Watson, Jr., Director [6] | 50,000 | 0 | 21,499 | 1.0% | * | 4.3% | 1.1% |
| All directors and officers as a group (11 persons named above) | 3,069,000 | 448,606 | 62,317 | 58.2% | 100.0% | 12.5% | 61.0% |
| Longhorn Lodging, L.P. [9] | 1,200,000 | 0 | 0 | 22.8% | * | * | 17.1% |
| Ladnier-Singal Family Trust [10] | 481,004 | 0 | 0 | 9.1% | * | * | 6.9% |
| Craig Cerniglia | 0 | 0 | 42,491 | * | * | 8.6% | * |

* Less than 1%

(1) Beneficial Ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as set forth below, each of the beneficial owners listed above has direct ownership of and sole voting power and investment power with respect to the shares of its stock. For each beneficial owner above, any options exercisable within 60 days have been included in the denominator.

(2) Based on 5,272,004 shares of common stock outstanding as of January 28, 2019.

(3) Based on 448,606 shares of Gadsden Series A Preferred Stock outstanding as of January 28, 2019. Shares of Gadsden Series A Preferred Stock are, upon the occurrence of certain events, convertible into shares of common stock on the basis of 2.5 shares of common stock for each share of Gadsden Series A Preferred Stock. Holders of Gadsden Series A Preferred Stock vote with the holders of common stock on all matters on an as-converted to common stock basis.

(4) Based on 496,983 shares of Gadsden Series C Preferred Stock outstanding as of January 28, 2019. Shares of Gadsden Series C Preferred Stock are, upon the occurrence of certain events, convertible into shares of common stock on the basis of 1.25 shares of common stock for each share of Gadsden Series C Preferred Stock. Holders of Gadsden Series C Preferred Stock vote with the holders of common stock on all matters on an as-converted to common stock basis.

(5) Percentage of Total Voting Stock represents total ownership with respect to all shares of common stock, Gadsden Series A Preferred Stock and Gadsden Series C Preferred Stock, as a single class and on an as-converted to common stock basis.

(6) Includes the following restricted shares issued as compensation or director fees and which are subject to vesting as described under "Executive Compensation": John Hartman, 1,000,000 shares; George Bell, 500,000 shares; Scott Crist, 500,000 shares; Brian Ringel, 50,000 shares; Larry Finger, 250,000 shares; James Walesa,

150,000 shares; Jay Gratz, 50,000 shares; B.J. Parrish, 50,000 shares; Russell Platt, 50,000 shares; Robert Watson, 50,000 shares; and Richard Morris, 25,000 shares.

(7)     Includes a senior convertible note payable to Strategic Advisory, Incorporated. The note is convertible into 11,500 shares of Gadsden Series C Preferred Stock. Mr. Finger has voting and dispositive power over the securities held by Strategic Advisory, Incorporated and may be deemed to be a beneficial owner of such securities. Mr. Finger disclaims beneficial ownership of the securities owned directly by Strategic Advisory, Incorporated, other than his pecuniary interest in such entity.

205

(8)   Series A shares are held by Forum Global Finance SCSp and its affiliate Greppon Advisors, LLC, a global real estate investment and asset management firm.  Russell Platt is the co-founder, Chief Executive Officer, Managing Director and a principal shareholder. He has voting and dispositive power over the securities and may be deemed to be a beneficial owner of such securities. Mr. Platt disclaims beneficial ownership of the shares owned directly by Forum Global Finance SCSp and its affiliate Greppon Advisors, LLC, other than his pecuniary interest in such entity.

(9)   Cibolo Creek Partners, LLC is the general partner of Longhorn Lodging, L.P. and may be deemed to be a beneficial owner of such shares. James Walesa is the beneficial owner of 3.66% of Cibolo Creek Partners, LLC and B.J. Parrish is a member of its Board of Governors and holds a limited liability company profits interest in Cibolo Creek Partners, LLC. Each of Mr. Walesa and Mr. Parrish disclaim beneficial ownership of the shares owned directly or indirectly by Cibolo Creek Partners, LLC or Longhorn Lodging, L.P., other than their pecuniary interest in such entities. The address of Longhorn Lodging, L.P. is 400 W. Illinois, Suite 950, Midland, Texas 79701. The board of directors of Cibolo Creek Partners, LLC has voting control over the shares held by Longhorn Lodging, L.P. Gadsden has been informed that the board members of Cibolo Creek Partners, LLC are Steve Person, H.H. "Tripp" Wommack, B.J. Parrish and George Wommack, and that the address of such individual is c/o Cibolo Creek Partners, LLC whose address is 400 W. Illinois, Suite 950, Midland, TX 79701.

(10)  Shares are registered in the name of SRS, LLC. Gadsden has been advised by SRS, LLC that the beneficial owner of the limited liability company interests in SRS, LLC is First Capital Master Advisor, LLC, or FCMA, under an arrangement to acquire the SRS, LLC limited liability company interests; and has been advised by FCMA that its sole member is the Ladnier-Singal Family Trust whose sole co-trustees are Magique Ladnier and Suneet Singal and that the address for such persons is c/o SRS, LLC, 2355 Gold Meadow Way, Suite 160, Gold River, CA 95670.

Except as contemplated by the merger agreement, Gadsden does not currently have any arrangements which if consummated may result in a change of control of Gadsden.

## Security Ownership of GPI after Merger

The following table sets forth information regarding beneficial ownership of the voting stock of GPI following the merger (i) by each person who is known by us who will beneficially own more than 5% of voting stock; (ii) by each of the persons who will serve as directors and executive officers of GPI; and (iii) by all of the persons who will serve as directors and executive officers of GPI as a group. This table also assumes that the transactions contemplated by the remediation agreement described under "Management's Discussion and Analysis of Financial Condition and Results of Operations for FC Global—Liquidity and Capital Resources—Remediation Agreement" have occurred. Unless otherwise specified, the address of each of the persons set forth below is in care of Gadsden, 15150 N. Hayden Road, Suite 220, Scottsdale, Arizona 85260.

| Name and Address of Beneficial Owner | Amount of Beneficial Ownership[1] | | | Percent of Common Stock[2] | Percent of Series A Preferred Stock[3] | Percent of Series C Preferred Stock[4] | Percent of Total Voting Stock[5] |
|---|---|---|---|---|---|---|---|
| | Common Stock | Series A Preferred Stock | Series C Preferred Stock | | | | |
| John Hartman, CEO and Director [6] | 25,877,953 | 0 | 0 | 18.4% | * | * | 14.5% |
| George Bell, COO [6] | 11,970,168 | 0 | 0 | 8.5% | * | * | 6.7% |
| Scott Crist, CFO [6] | 10,764,540 | 0 | 0 | 7.6% | * | * | 6.0% |
| Brian Ringel, Corporate Controller [6] | 1,076,454 | 0 | 0 | * | * | * | * |
| Richard M. Morris, Secretary [6] | 1,614,681 | 0 | 2,500 | 1.1% | * | * | 1.0% |
| Larry E. Finger, Chairman [6][7] | 5,382,270 | 0 | 33,004 | 3.8% | * | 6.6% | 3.5% |
| James Walesa, Vice Chairman [6] | 4,865,572 | 0 | 0 | 3.5% | * | * | 2.7% |
| Jay M. Gratz, Director [6] | 1,076,454 | 0 | 5,314 | * | * | 1.1% | * |

| | | | | | | |
|---|---|---|---|---|---|---|
| B.J. Parrish, Director [6] | 1,291,745 | 0 | 0 | * | * | * | * |
| Russell C. Platt, Director [6][8] | 1,076,454 | 448,606 | 0 | * | 100.0% | * | 14.1% |
| Robert G. Watson, Jr., Director [6] | 1,076,454 | 0 | 21,499 | * | * | 4.3% | 1.0% |
| Michael R. Stewart, Director | 400,000 | 0 | 0 | * | * | * | * |
| Kristen E. Pigman, Director [9] | 13,841,684 | 0 | 0 | 9.8% | * | * | 7.8% |
| All directors and officers as a group (13 persons named above) | 80,314,428 | 448,606 | 40,818 | 57.0% | 100.0% | 12.5% | 59.5% |
| Longhorn Lodging, L.P. [10] | 25,834,895 | 0 | 0 | 18.3% | * | * | 14.5% |
| Ladnier-Singal Family Trust [11] | 10,355,573 | 0 | 0 | 7.4% | * | * | 5.8% |
| Craig Cerniglia | 0 | 0 | 42,491 | * | * | 8.6% | * |

206

* Less than 1%

(1)  Beneficial Ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as set forth below, each of the beneficial owners listed above has direct ownership of and sole voting power and investment power with respect to the shares of its stock. For each beneficial owner above, any options exercisable within 60 days have been included in the denominator.

(2)  Based on 140,837,640 shares of common stock outstanding after the merger.

(3)  Based on 448,606 shares of GPI Series A Preferred Stock outstanding after the merger. Shares of GPI Series A Preferred Stock are, upon the occurrence of certain events, convertible into shares of common stock on the basis of 2.5 shares of common stock for each share of GPI Series A Preferred Stock. Holders of GPI Series A Preferred Stock vote with the holders of common stock on all matters on an as-converted to common stock basis.

(4)  Based on 496,983 shares of GPI Series C Preferred Stock outstanding after the merger. Shares of GPI Series C Preferred Stock are, upon the occurrence of certain events, convertible into shares of common stock on the basis of 1.25 shares of common stock for each share of GPI Series C Preferred Stock. Holders of GPI Series C Preferred Stock vote with the holders of common stock on all matters on an as-converted to common stock basis.

(5)  Percentage of Total Voting Stock represents total ownership with respect to all shares of common stock, GPI Series A Preferred Stock and GPI Series C Preferred Stock, as a single class and on an as-converted to common stock basis.

(6)  Includes the following restricted shares issued as compensation or director fees and which are subject to vesting as described under "Executive Compensation": John Hartman, 21,529,000 shares; George Bell, 10,764,500 shares; Scott Crist, 10,764,540 shares; Brian Ringel, 1,076,454 shares; Larry Finger, 5,382,270 shares; James Walesa, 3,229,350 shares; Jay Gratz, 1,076,454 shares; B.J. Parrish, 1,076,454 shares; Russell Platt, 1,076,454 shares; Robert Watson, 1,076,454 shares; and Richard Morris, 538,225 shares.

(7)  Includes a senior convertible note payable to Strategic Advisory, Incorporated. The note is convertible into 11,500 shares of Gadsden Series C Preferred Stock. Mr. Finger has voting and dispositive power over the securities held by Strategic Advisory, Incorporated and may be deemed to be a beneficial owner of such securities. Mr. Finger disclaims beneficial ownership of the securities owned directly by Strategic Advisory, Incorporated, other than his pecuniary interest in such entity.

(8)  Series A shares are held by Forum Global Finance SCSp and its affiliate Greppon Advisors, LLC, a global real estate investment and asset management firm.  Russell Platt is the co-founder, Chief Executive Officer, Managing Director and a principal shareholder. He has voting and dispositive power over the securities and may be deemed to be a beneficial owner of such securities. Mr. Platt disclaims beneficial ownership of the shares owned directly by Forum Global Finance SCSp and its affiliate Greppon Advisors, LLC, other than his pecuniary interest in such entity.

(9)  Represents shares held by Opportunity Fund I-SS, LLC. Kristen Pigman is the Director of OP Fund I Manager, LLC, which is the member and manager of Opportunity Fund I-SS, LLC, and has voting and dispositive power over the securities held by it. Mr. Pigman disclaims beneficial ownership of such securities.

207

(10)   Cibolo Creek Partners, LLC is the general partner of Longhorn Lodging, L.P. and may be deemed to be a beneficial owner of such shares. James Walesa is the beneficial owner of 3.66% of Cibolo Creek Partners, LLC and B.J. Parrish is a member of its Board of Governors and holds a limited liability company profits interest in Cibolo Creek Partners, LLC. Each of Mr. Walesa and Mr. Parrish disclaim beneficial ownership of the shares owned directly or indirectly by Cibolo Creek Partners, LLC or Longhorn Lodging, L.P., other than their pecuniary interest in such entities. The address of Longhorn Lodging, L.P. is 400 W. Illinois, Suite 950, Midland, Texas 79701. The board of directors of Cibolo Creek Partners, LLC has voting control over the shares held by Longhorn Lodging, L.P. Gadsden has been informed that the board members of Cibolo Creek Partners, LLC are Steve Person, H.H. "Tripp" Wommack, B.J. Parrish and George Wommack, and that the address of such individual is c/o Cibolo Creek Partners, LLC whose address is 400 W. Illinois, Suite 950, Midland, TX 79701.

(11)   Shares are registered in the name of SRS, LLC. Gadsden has been advised by SRS, LLC that the beneficial owner of the limited liability company interests in SRS, LLC is First Capital Master Advisor, LLC, or FCMA, under an arrangement to acquire the SRS, LLC limited liability company interests; and has been advised by FCMA that its sole member is the Ladnier-Singal Family Trust whose sole co-trustees are Magique Ladnier and Suneet Singal and that the address for such persons is c/o SRS, LLC, 2355 Gold Meadow Way, Suite 160, Gold River, CA 95670.

208

# EXHIBIT R

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

**GORDON D SCHABER COURTHOUSE**

**MINUTE ORDER**

DATE: 05/15/2019                     TIME: 09:00:00 AM          DEPT: 54

JUDICIAL OFFICER PRESIDING: Christopher Krueger
CLERK:  G. Toda
REPORTER/ERM: L. Millett #12958
BAILIFF/COURT ATTENDANT: N. Alvi, R. Mays

CASE NO: **34-2018-00227994-CU-EN-GDS** CASE INIT.DATE: 02/27/2018
CASE TITLE: **JFurti LLC vs. Suneet Singal**
CASE CATEGORY: Civil - Unlimited

---

**EVENT TYPE**: Motion - Other - Civil Law and Motion

---

 **APPEARANCES**
 Joshua D Brinen, counsel, present for Defendant(s).
 Andrew B. Levin for plaintiff
 Abigail V. O'Brient for plaintiff

---

**Nature of Proceeding: Motion for Post Judgment Relief Order**

**TENTATIVE RULING**

Plaintiff Plaintiff/judgment creditor JFURTI, LLC's ("JFURTI") consolidated motion for post-judgment relief for order (1) charging judgment debtor's membership interests in two wholly-owned limited liability companies; (2) assigning certain assets; and (3) amending the judgment to name additional judgment debtors is ruled upon as follows.

**I.   Factual Background**

JFURTI filed suit in New York against defendants/judgment debtors Suneet Singal ("Singal") and several business entities, ultimately obtaining a multi-million dollar judgment.  JFURTI sought and obtained the entry of a sister state judgment here in California in 2018 and is currently attempting to collect on the judgment through a variety of means.

By this motion, JFURTI move for an order:

1.   Pursuant to Code of Civil Procedure section 708.310 and Corporations Code sections 17705.03-04, charging the Ladnier-Singal Family Trust's (the "Trust") direct and/or indirect membership interests in First Capital Master Advisor, LLC ("FCMA") and SRS, LLC, ("SRS") which public SEC filings show to be wholly owned by the Trust, with payment of the unpaid balance of the judgment entered in this action, which currently exceeds $23.7 million;

2.   Directing FCMA and SRS to pay any money or property due or to become due to
any judgment debtor in this case directly to Judgment Creditor until the amount remaining due on the judgment, plus all accrued interest and post-judgment costs thereon, is paid in full;

3.   Pursuant to Code of Civil Procedure section 708.510(a), assigning to Judgment

---

DATE: 05/15/2019                                    MINUTE ORDER                                         Page 1
DEPT: 54                                                                                           Calendar No.

Case 2:18-mc-00161-TLN-DB   Document 20-1   Filed 07/02/19   Page 42 of 44

Creditor (a) a $25 million debt from StHealth Capital Partners LLC (the "StHealth Obligation"); and (b) shares of a soon-to-be public REIT, Gadsden Growth Properties, Inc., held by or for the benefit of judgment debtor Suneet Singal, through the Trust (the "Gadsden Shares"), and all rights to payment under either of the foregoing to the extent necessary to pay Judgment Creditor's judgment in full, including accrued interest through the date of payment;

4.   Providing that StHealth Capital Partners LLC and Gadsden Growth Properties, Inc. shall, upon service of notice of entry of any order on the Motion, transfer the StHealth Obligation and the Gadsden Shares directly to Judgment Creditor; and

5.   In the alternative, amending the Judgment entered in this case to name as additional judgment debtors pursuant to the Code of Civil Procedure section 187, each of First Capital Master Advisor, LLC, SRS, LLC, Suneet Singal (in his capacity as the trustee of the Trust), Majique Ladnier (in her capacity as the trustee of the Trust), Stephen Goodwin (in his capacity as the trustee of the Trust) and Jeannine DeVries (in her capacity as the trustee of the Trust).

## II.  Analysis

a.   Charging Order pursuant to CCP §708.310, Corp. Code §11705.03 and Prob. Code §18200

California Code of Civil Procedure Section 708.310 provides that if a money judgment is rendered against a member, but not against the limited liability company, the Judgment Debtor's interest in the limited liability company may be applied toward the satisfaction of the judgment by an order charging the Judgment Debtor's interest, pursuant to Section 17705.03 of the California Corporations Code.

Corporations Code Section 17705.03, which is applicable here, provides that the Court that entered the judgment may charge the assignable membership interest of the debtor-member with payment of the unsatisfied amount of the judgment and interest and costs thereon and may make all other orders which the circumstances of the case require.

Probate Code §18200 provides "[i]f the settlor retains the power to revoke the trust in whole or in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor."

i. Existence of  a Revocable Trust

JFURTI first insists that based on the testimony of Majique Ladnier ("Ladnier"), Singal's spouse, the Trust is revocable and subject to Probate Code §18200. (Declaration of Abigail O'Brien ("O'Brien Decl."), Ex. A. 91:13-93:3.)  Ladnier testified that she and Singal are Trustors of the Trust, which is revocable, and their children are the beneficiaries of the Trust.  (*Id.*)  JFURTI notes that Singal's testimony regarding the Trust has been inconsistent.  He initially claimed no knowledge of the Trust, then claimed that the Trust was irrevocable.  Both Ladnier and Singal have refused to produce the Trust agreement and have signed verifications stating that they are unable to obtain copies of the Trust documents.  (Motion, 7:12-27, fn. 4 and exhibits cited therein.)

Singal's opposes, claiming that JFURTI fails to establish the existence of a valid trust since Ladnier did not testify to, and JFURTI "does not allege, that there is a competent trustor, the intent of the trust, the property in the trust, the purpose of the trust, or the beneficiary of the trust, all of which are required elements of a valid trust."  (Opposition, 3:6-9.) The Court is not persuaded by Singal's argument, especially since he testified in February 2019 as to the existence of the Trust and that his California home was transferred into the Trust three or four years ago. (O'Brien Decl., Ex. B, 41:11-22.) Moreover, in reply, JFURTI submits an incomplete copy of the Trust Agreement showing that the Trust is

---

a revocable.  Singal, on the other hand, proffers no evidence disputing that the Trust is revocable.

The Court, therefore, concludes that the Trust is a valid and revocable.

ii.     The Trust's Membership Interests in FCMA and SRS

In order to establish the Trust's membership interests in FCMA and SRS, JFURTI points to an SEC filing by FC Global Realty, Inc. ("FCGR") in which the Trust is identified as owning 481,004 shares of FCGR. As Singal correctly notes, while the Court may properly judicially notice the fact that FCGR filed this document with the SEC, it may not judicially notice the truth of hearsay statements contained within the document. (Evid. Code, §§ 452(h) and 459; *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7.) Nonetheless, the Court need not rely on the SEC filing since JFURTI has proffered Singal's deposition testimony in which he testified that the Trust owns FCMA and SRS is wholly owned by FCMA.  (O'Brien Decl., Ex. D, 19:19-28:19.)  Importantly, Singal tenders no evidence to dispute JFURTI's argument.

Accordingly, the motion for a charging order and directing FCMA and SRS to pay any money or property due or to become due to any judgment debtor in this case directly to JFURTI is GRANTED.

iii.    Assignment/Transfer of FCMA's and SRS' Interests in the StHealth Obligation and the Gadsen Shares

JFURTI argues that in order to make the charging order effective, the Court should assign FCMA's and SRS's interests in the StHealth Obligation and the Gadsen Shares.  JFURTI submits evidence that FCMA is owed a debt of $25 million for the StHealth Obligation. SRS also has a right to the Gadsen Shares in the amount of $4.8 million.  (O'Brien Decl., Ex. B, 17:11-20:25; Ex. D, 19:19-28:19.)

Code of Civil Procedure § 708.510 provides: "(a) Except as otherwise provided by law, upon application of the judgment creditor on noticed motion, the court may order the judgment debtor to assign to the judgment creditor or to a receiver appointed pursuant to Article 7 (commencing with Section 708.610) all or part of a right to payment due or to become due, whether or not the right is conditioned on future developments, underline including but not limited to the following types of payments: (1) Wages due from the federal government that are not subject to withholding under an earnings withholding order. (2) Rents. (3) Commissions. (4) Royalties. (5) Payments due from a patent or copyright. (6) Insurance policy loan value."

The Court has broad discretion in deciding whether to order an assignment and in exercising its discretion may consider relevant factors such as the amount remaining due on the judgment and the amount remaining to be received on the right to payments. (CCP § 708.510(c).) A right to payment may be assigned "only to the extent necessary to satisfy the money judgment."  (CCP § 708.510(d).)

Singal counters that CCP §708.510 "excludes the assignment of any property that is not already assignable."  (Opposition, 5:13-16, citing *Kracht v. Perrin* (1990) 219 Cal.App.3d 1019, 1021, fn. 1 ["the Legislature specifically noted that section 708.510 '. . . does not make any property assignable that is not already assignable.'"].)  Singal's reliance on *Kracht* is misplaced since it concerns the assignment of a underline legal malpractice action and such actions are not assignable under California law.  Singal provides no legal authority to support his argument that the StHealth Obligation and the Gadsen Shares are not assignable.

The motion to assign/transfer FCMA's and SRS' Interests in the StHealth Obligation and the Gadsen Shares is GRANTED.

Having granted the motion on the above grounds, the Court need not consider JFURTI's alternative

CASE TITLE: JFurti LLC vs. Suneet Singal    CASE NO: **34-2018-00227994-CU-EN-GDS**

Case 2:18-mc-00161-TLN-DB   Document 20-1   Filed 07/02/19   Page 44 of 44

motion to amend the judgment.

JFURTI shall submit a formal order for the Court's signature pursuant to CRC Rule 3.1312,

**COURT RULING**

The matter was argued and submitted.

The matter was taken under submission.

**SUBMITTED MATTER RULING**

Having taken the matter under submission, the Court now rules as follows: The Court affirmed the tentative ruling and signed the order.